UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JAMIE L. MARSHALL, as Administrator )
and Personal Representative of the Estate of )
Christopher J. Marshall, and on her own behalf )
individually, et al., )
)
     Plaintiffs, )
)
vs. )    Case No. 4:25-cv-01410-SRC
)
MERCY HOSPITAL EAST )
COMMUNITIES, et al., )
)
     Defendants. )

## FIRST AMENDED COMPLAINT AND JURY DEMAND

COME NOW Plaintiffs, JAMIE L. MARSHALL ("Ms. Marshall"), as duly appointed

Administrator and personal representative of the Estate of CHRISTOPHER J. MARSHALL for a survival

claim, and individually on her own behalf as a statutory beneficiary for a wrongful death claim, MOLLY

MARSHALL, individually on her own behalf as a statutory beneficiary for a wrongful death claim,

MEGAN MARSHALL, individually on her own behalf as a statutory beneficiary for a wrongful death

claim, MACKENZIE MARSHALL, individually on her own behalf as a statutory beneficiary for a

wrongful death claim, and BRENDA MARSHALL, individually on her own behalf as a statutory

beneficiary for a wrongful death claim, and for their First Amended Complaint and Jury Demand and

causes of action against Defendants MERCY HOSPITALS EAST COMMUNITIES (d/b/a MERCY

HOSPITAL ST. LOUIS) (hereinafter "Mercy Hospital"), RYAN L. KROEGER, D.O. ("Dr. Kroeger"),

TARIQ HALASA, M.D. ("Dr. Halasa"), and DOE DEFENDANTS 1-5, incorporating herein Amended

Counts VII and VIII, which The Court granted Plaintiffs leave to file by order dated July 17, 2026, hereby

state, allege and aver as follows:

## NATURE OF ACTION

1.      This is a combined survival action and an action for wrongful death arising from the medical negligence of: Mercy Hospital and its employees and agents who, on information and belief, were acting within the course and scope of their employment and agency, Dr. Kroeger, and Dr. Halasa, as well as certain involved but as-yet unidentified Doe Defendants, which negligence proximately caused the pain and suffering of impending death and the death of decedent Christopher J. Marshall (hereinafter "Mr. Marshall") on September 29, 2023.

2.      In the days preceding his death, decedent Mr. Marshall presented for emergent treatment of idiopathic necrotizing pancreatitis.

3.      Mr. Marshall was diagnosed with sepsis upon his admission at Mercy Hospital in the days preceding his death.

4.      Mr. Marshall had been discharged by Mercy Hospital despite suffering from ongoing infection and necrotizing pancreatitis mere days prior to his readmission in the days preceding his death.

5.      On September 28, 2023, while admitted to Mercy Hospital and late in the evening, Mr. Marshall's pain increased dramatically despite regular administration of high-dose potent painkillers, and Mr. Marshall was placed on a self-administered pain pump by Dr. Kroeger and moved to a higher level of care and observation in the hospital.

6.      On the next day, notwithstanding the additional pain treatments, Mercy Hospital records reflected that Mr. Marshall had been vomiting and in pain throughout the night of September 28, 2023.

7.      Mr. Marshall was not in the intensive care unit despite his posing severe risk for aspiration given his ongoing medical conditions, including the extreme pain he was experiencing, and his overnight difficulties with nausea and vomiting.

8.   Mr. Marshall was not on a sepsis protocol despite his diagnosis with sepsis on his admission.

9.   A hospitalist did not round on Mr. Marshall for over 18 hours after Dr. Kroeger assessed him and ordered the self-administered pain pump

10.   A hospitalist did not round on Mr. Marshall promptly even after the report of vomiting all night and Mr. Marshall's pain issues were documented in his medical record.

11.   When Dr. Halasa finally rounded on Mr. Marshall at 3:55 p.m., he also noted that Mr. Marshall had been vomiting all night the prior night, and ordered an NG tube with low intermittent suction.

12.   The NG tube was placed within the following 45 minutes, but its placement was not checked and suction was not connected.

13.   A "STAT" CT was ordered between 4:45 p.m. and 5:15 p.m.  Suction was again ordered, but the NG tube placement was not checked and suction was not connected.

14.   A CT exam done more than an hour later confirmed that Mr. Marshall was at high risk for aspiration.

15.   On return to the hospital room soon thereafter, still without suction attached to the NG tube, Mr. Marshall again began vomiting.

16.   The nurse indicated in the medical records of Mercy Hospital that suction in the room was not working.

17.   Without operational suction, or with staff with insufficient or inadequate training to operate the suction, Mr. Marshall aspirated, suffered as he choked on his own vomit, and ultimately died.

18.   As a proximate result of Defendants' negligence in caring for Mr. Marshall, Mr. Marshall suffered and died at their hands.

19.     This case is brought by Plaintiff as administrator and personal representative of Mr. Marshall's Estate for the survival action, and collectively on behalf of each of the statutory beneficiaries of Mr. Marshall with regard to the wrongful death action.

20.     Defendants are liable to the Estate and to the statutory beneficiaries for all damages permissible by law, in amounts to be determined at trial.

## PARTIES

21.     Plaintiff, JAMIE L. MARSHALL, is a natural person and resident of the State of Illinois, and is the surviving lawful spouse of decedent, CHRISTOPHER J. MARSHALL, and therefore is a lawful beneficiary of the wrongful death action for the death of Mr. Marshall.

22.     Plaintiff, JAMIE MARSHALL, is also the duly appointed Administrator and personal representative of the Estate of CHRISTOPHER J. MARSHALL, by the Circuit Court of the State of Illinois in Madison County, on or about January 3, 2024, under Cause No. 2023 PR 00487, and therefore is the proper party for the survival action of the Estate.

23.     Plaintiff, MOLLY MARSHALL, is a natural person and resident of the State of Washington, and is a surviving daughter of decedent, CHRISTOPHER J. MARSHALL, and therefore is a lawful beneficiary of the wrongful death action for the death of Mr. Marshall.

24.     Plaintiff, MEGAN MARSHALL, is a natural person and resident of the State of Illinois, and is a surviving daughter of decedent, CHRISTOPHER J. MARSHALL, and therefore is a lawful beneficiary of the wrongful death action for the death of Mr. Marshall.

25.     Plaintiff, MACKENZIE MARSHALL, is a natural person and resident of the State of Illinois, and is a surviving daughter of decedent, CHRISTOPHER J. MARSHALL, and therefore is a lawful beneficiary of the wrongful death action for the death of Mr. Marshall.

26.     Plaintiff, BRENDA MARSHALL, is a natural person and resident of the State of Illinois, and is the surviving lawful parent of decedent, CHRISTOPHER J. MARSHALL, his mother, and therefore is a lawful beneficiary of the wrongful death action for the death of Mr. Marshall.

27.     Prior to his death, decedent, CHRISTOPHER J. MARSHALL, was a natural person and resident of the State of Illinois.

28.     Defendant, MERCY HOSPITAL, is a public corporation formed and existing by the laws of the State of Missouri, with a business address of 615 S. New Ballas Rd., Creve Coeur, St. Louis County, Missouri 63141. It is present and transacting business in the State of Missouri and in this judicial district.

29.     Defendant, RYAN L. KROEGER, D.O., is, on information and belief, an individual resident of the State of Missouri.  On information and belief, Dr. Kroeger was an employee of Defendant, MERCY HOSPITAL, during the time period at issue in this case, and was working as a Hospitalist for same and acting within the course and scope of his employment in providing medical care to Mr. Marshall on behalf of Defendant, MERCY HOSPITAL.

30.     Defendant, TARIQ HALASA, M.D., is, on information and belief, an individual resident of the State of Missouri.  On information and belief, Dr. Halasa was an employee of Defendant, MERCY HOSPITAL, during the time period at issue in this case, and was working as a Hospitalist for same and acting within the course and scope of his employment in providing medical care to Mr. Marshall on behalf of Defendant, MERCY HOSPITAL.

31.     DOES 1 to 5 are persons or entities whose true names and identities are not known to Plaintiffs at this time. These defendants may include individual healthcare providers who provided health care to decedent Mr. Marshall, such as physicians, nurses, and/or technicians, as well as others involved in provision of the healthcare at issue in this matter. On information and belief, these defendants, and each

of them, are residents of the State of Missouri, and/or are present and transacting business in the State of Missouri and in this judicial district.

## JURISDICTION & VENUE

32. This Court has jurisdiction over the subject matter of this claim, pursuant to RSM §§ 537.021 and 538.210, because this action represents both a survival action and a wrongful death action resulting from the negligence of Defendants in the medical treatment of Mr. Marshall in St. Louis County, Missouri.

33. This Court has personal jurisdiction over Defendant Mercy Hospital because it is a public corporation formed and existing pursuant to the laws of the State of Missouri, because its principal place of business is within this judicial district, because its registered agent for service of process is located within this judicial district, and because it is present and transacting business in this judicial district.

34. This Court has personal jurisdiction over Defendant Ryan L. Kroeger, D.O., because, on information and belief, he is an individual resident of the State of Missouri, because he was licensed to provide healthcare services in the State of Missouri in the specified time period, and because he participated in the acts alleged to have caused injury in this judicial district by providing care violative of the applicable standard of care to Mr. Marshall at Defendant Mercy Hospital during the time period specified herein. Each of these establish that Dr. Kroeger purposefully availed himself of the protections of the laws of the State of Missouri via regular systematic contacts with this State, such that the exercise of personal jurisdiction by this Court does not offend traditional notions of fair play and substantial justice.

35. This Court has personal jurisdiction over Defendant Tariq Halasa, M.D., because, on information and belief, he is an individual resident of the State of Missouri, because he was licensed to provide healthcare services in the State of Missouri in the specified time period, and because he participated in the acts alleged to have caused injury in this judicial district by providing care violative of

the applicable standard of care to Mr. Marshall at Defendant Mercy Hospital during the time period specified herein. Each of these establish that Dr. Halasa purposefully availed himself of the protections of the laws of the State of Missouri via regular systematic contacts with this State, such that the exercise of personal jurisdiction by this Court does not offend traditional notions of fair play and substantial justice.

36.     On information and belief, this Court has personal jurisdiction over Doe Defendants 1-5, and each of them, because each such defendant is licensed to provide healthcare services in the State of Missouri, because each such defendants is present and transacting business in this judicial district, because each such defendant is—on information and belief—a resident of the State of Missouri, and because, for all purposes herein, each such Defendant purposefully availed themselves of the protections of the laws of the State of Missouri via regular systematic contacts with this State, such that the exercise of personal jurisdiction by this Court does not offend traditional notions of fair play and substantial justice.

## **GENERAL ALLEGATIONS**

37.     On September 27, 2023, Mr. Marshall, then just 47 years of age, presented to Defendant emergently for readmission for idiopathic necrotizing pancreatitis.  His chief complaints were abdominal pain and pressure at that time.

38.     Mr. Marshall had been admitted just days earlier at Mercy Hospital, but had been discharged despite having acute on chronic necrotizing pancreatitis and an ongoing infection at the time of discharge.

39.     His readmission to Mercy Hospital on September 27, 2023, was the result of his deterioration following discharge and his necessary visit to a local emergency room that transferred him back to Mercy Hospital.

40.     A CT shortly following readmission indicated that Mr. Marshall had a large loculated peripancreatic fluid collection in the mid-abdomen extending into the left upper abdominal quadrant, as well as large volume pelvic ascites.

41.     Mr. Marshall's white blood count was elevated upon admission, and his blood pressure was just 107/74, with a heart rate of 102.

42.     Mr. Marshall was found to have sepsis on admission to Mercy Hospital.

43.     The following day, September 28, 2023, Mr. Marshall underwent an ultrasound-guided paracentesis, where 3 liters of fluid was removed.  The fluid was described as "green and cloudy" in nursing notes.

44.     Late in that day, Mr. Marshall reported spiking pain.

45.     Mr. Marshall was placed on a PCA pump of hydromorphone at the order of Defendant Dr. Kroeger in the evening of September 28, 2023, around 9:30 p.m., due to significantly increased reported abdominal pain that was not being controlled by regularly-administered intravenous hydromorphone at a medium to high dose.

46.     A PCA pump is a patient-controlled administration of potent pain medication in addition to background administration of pain medication.  It is to allow a patient to have some control of pain medication administration to address severe pain and in an effort to relieve the patient of same.

47.     The administration of a PCA pump and its utilization by a patient requires close monitoring by hospital staff due to the risks that it poses to the patient.  The need for use of a PCA pump, namely significant uncontrolled pain, also indicates the need for much closer supervision of a patient by hospital staff to determine what may be causing the significant pain to be addressed through utilization of the PCA pump.

48.     The following day, around noon on September 29, 2023, it was noted by Dr. Jad Khoury, "Had a rough night with abrupt onset of diffuse abdominal pain. He has been vomiting/coughing up bilious material."

49.     Despite being placed on a PCA pump at the order of Defendant Dr. Kroeger entered around 9:30 p.m. on September 28, 2023, a Hospitalist at Mercy Hospital did not round on Mr. Marshall until 3:55 p.m. on September 29, 2023, when Defendant Dr. Halasa examined him.

50.     Consistent with the documented report from nearly four hours before Defendant Dr. Halasa examined him at about 3:55 p.m. on September 29, 2023, Dr. Halasa noted that Mr. Marshall had a distended abdomen and also noted that Mr. Marshall had been vomiting bilious material.

51.     Defendant Dr. Halasa at that time also noted that Mr. Marshall had been suffering from the abrupt onset of severe abdominal pain.

52.     At that point, Mr. Marshall had already been reported to have been vomiting overnight the prior night.

53.     At that point, Mr. Marshall had been on a PCA pump for about 18 hours due to significant pain.

54.     Defendant Dr. Halasa at that time ordered that a naso-gastric tube be placed in Mr. Marshall and for low intermittent suction to be used in conjunction therewith.

55.     Based on the documented records, the naso-gastric tube was placed in Mr. Marshall prior to 4:45 p.m. on September 29, 2023.

56.     However, the placement of the naso-gastric tube was not checked and suction was not connected when the naso-gastric tube was placed, despite the order for low intermittent suction and despite available methods to allow for the placement to be checked and suction to be connected immediately.

57.     A surgical consult between 4:45 p.m. and 5:15 p.m. thereafter also again recommended or ordered that suction be connected, but it still did not occur immediately, or, as it turns out, at all.

58.     A "STAT" CT of Mr. Marshall's abdomen was ordered at 5:26 p.m.

59.     Witnesses observed Mr. Marshall's bed to have only been slightly inclined, on information and belief less than 30 degrees of elevation.

60.     There should have been an order and confirmation that Mr. Marshall's bed was angled at a minimum of 30 degrees of elevation, particularly given his vomiting the prior night.

61.     No effort was made to increase the incline of Mr. Marshall's bed.

62.     A chest X-ray done on September 29, 2023, showed fluid overload.

63.     Abdominal X-rays showed air fluid levels favoring an ileus.

64.     Late in the evening, a further CT was performed, which indicated that "[f]luid-filled esophagus and distended stomach despite the enteric tube in place. This places the patient at risk for aspiration."

65.     The risk of aspiration from the placement of an NG tube in a patient vomiting bilious material is a known risk at Mercy Hospital, or any hospital, and among the doctors working in the hospital. The concomitant administration of suction with the NG tube is essential to reduce that risk.

66.     The NG tube without use of suction actually increases risk of aspiration because it allows for stomach contents to escape the stomach into the esophagus.

67.     On return to his hospital room from that CT, family observed that Mr. Marshall's bed was still only slightly inclined, on information and belief less than 30 degrees of elevation.

68.     Mr. Marshall had been diagnosed as being septic, as noted above, but had not been placed on sepsis protocol by Mercy Hospital.

69.    Mr. Marshall was not in the intensive care unit, despite the complexity of his condition, the deterioration of his condition, and the apparent risks of aspiration from his persistent vomiting, his collection of fluids, and the placement of an NG tube without use of suction.

70.    Mr. Marshall began vomiting again shortly following his return from getting the further CT (with a finding described above) on September 29, 2023.  Initially, family members watched in horror as the nurse took no immediate action to aid Mr. Marshall, who appeared to be struggling and aspirating his vomit.

71.    The nurse thereafter began to try to roll Mr. Marshall onto his side, but the effort was slow and plodding.

72.    Mr. Marshall continued to aspirate his own vomit.

73.    A nurse's note recorded in Mercy Hospital's medical records for Mr. Marshall indicated that the suction was not working in Mr. Marshall's hospital room.

74.    Suction was not utilized in the room on Mr. Marshall, either because (as reflected in the nurse's note) it was not working in the room or because the Mercy Hospital staff were insufficiently or inadequately trained to use it.

75.    Suction was essential to decompress Mr. Marshall's stomach and to clear his airway.

76.    Mr. Marshall died as a result of his aspiration of his own vomit, which ultimately resulted in his suffering cardiac arrest.  Tragically, Mr. Marshall could not be resuscitated.

77.    Mr. Marshall suffered through a period of time during which he was horrifically choking on his own vomit, unable to breathe, in severe pain, frantic, and unable to clear his own airway.

78.    Mr. Marshall died intestate.

79.     Mr. Marshall has multiple surviving statutory beneficiaries for purposes of this action, including a surviving spouse, Ms. Marshall, a mother, Brenda, and three daughters, Molly, Megan, and Mackenzie.

80.     To the extent that any person or entity is at fault in this case, Plaintiffs and the decedent are fault-free.

81.     Due to Defendants failing to comply with the applicable standard of care, Plaintiffs' decadent and his beneficiaries suffered  damages which include but not be limited to: loss of decedent's life, incurred medical bills, suffered a loss of a normal life, suffered disability, suffered permanent injuries, suffered conscious pain and suffering, suffered mental anguish, suffered wage loss, suffered a loss of earning capacity, suffered a loss of companionship, suffered a loss of household services, suffered pecuniary damages, and other damages to be determined by the jury.

### FIRST CAUSE OF ACTION – Medical Negligence / Wrongful Death
### BROUGHT BY ALL BENEFICIARIES
### AGAINST DEFENDANT MERCY HOSPITAL

82.     Paragraphs 1-81 are hereby restated and realleged.

83.     Mercy Hospital owed decedent Mr. Marshall the duty to comply with the applicable standard of care in the provision of medical care to him.

84.     Defendant, Mercy Hospital, breached its duty to comply with the applicable standard  of care in one, or more, or all of the following ways:

a.     Failure to see that its staff timely rounded on Mr. Marshall, improperly delaying essential care;

b.     Failure to see that its staff timely ordered an NG tube and use of suction for Mr. Marshall;

c.     Failure to see that its staff timely effectuated and utilized suction following the placement of the NG tube;

d.      Failure to complete in timely fashion a CT that was ordered "STAT," delaying the use of suction;

e.      Failure to order and direct in timely fashion, or to otherwise check and confirm the placement of the NG tube to allow for immediate use of suction following the NG tube placement;

f.      Failure to maintain operable suction in Mr. Marshall's hospital room, or the failure adequately to train hospital staff as to how to use suction in the room;

g.      Failure to see that its staff adequately elevated Mr. Marshall's bed to at least 30 degrees on incline to reduce the risk of aspiration and/or to train its staff as to the importance of same;

h.      Failure properly to monitor and assess the risks of Mr. Marshall's condition to avoid and/or react to emergent vomiting, aspiration of said vomit and the death of Mr. Marshall;

i.      Failure properly to train its staff with regard to the placement and use of NG tubes, suction and the elevation of a patient in order to prevent and/or minimize vomiting and the aspiration of vomiting;

j.      Failure properly to monitor and supervise its staff with regard to the placement and use of NG tubes, suction and the elevation of a patient in order to prevent and/or minimize vomiting and the aspiration of vomiting; and

k.      Otherwise acted negligently to be proven at trial.

85.     Defendant Mercy Hospital further breached its duty to comply with the applicable standard of care, including in the (a) insufficient and inadequate treatment of Mr. Marshall's infection prior to discharging him in the prior hospitalization; and (b) improper discharge of Mr. Marshall with severe and insufficiently treated necrotizing pancreatitis and the infection that led to his readmission within days with sepsis.

86.     As a proximate result of each of these breaches of the applicable standard of care, individually and collectively, Mr. Marshall aspirated, suffered respiratory and cardiac arrest, and died.

87.     As a proximate result of his untimely and wrongful death, Mr. Marshall's statutory beneficiaries have suffered economic and noneconomic damages, in amounts to be proven at trial.

88.     As a proximate result of his untimely and wrongful death, the Estate has suffered economic damages in amounts to be proven at trial.

89.     The undersigned attaches hereto and incorporates be reference herein Exhibit A to comply with RSMO § 538.225.

WHEREFORE, Plaintiffs pray for such damages in an amount in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) as are fair and reasonable to compensate them for their damages, plus costs of court.

## SECOND CAUSE OF ACTION – Medical Negligence / Wrongful Death
### BROUGHT BY ALL BENEFICIARIES
### AGAINST DEFENDANT DR. KROEGER

90.     Paragraphs 1-81 are hereby restated and realleged.

91.     Dr. Kroeger owed decedent Mr. Marshall the duty to comply with the applicable standard of care in the provision of medical care to him.

92.     Dr. Kroeger breached his duty to comply with the applicable standard of care in one, or more, or all of the following ways:

   a.     Failure timely to round on Mr. Marshall, improperly delaying essential care;

   b.     Failure timely to ordered an NG tube and use of suction for Mr. Marshall;

   c.     Failure timely to utilize or ensure the utilization of suction following the placement of the NG tube;

   d.     Failure timely to order and direct completion of an X-ray or CT of Mr. Marshall's abdomen despite his presentation;

   e.     Failure to order and direct in timely fashion, or to himself otherwise check and confirm the placement of the NG tube to allow for immediate use of suction following the NG tube placement;

g.    Failure adequately to elevate Mr. Marshall's bed to at least 30 degrees of incline to reduce the risk of aspiration and/or to order same; and

h.    Otherwise acted negligently to be proven at trial.

93.    As a proximate result of each of these breaches of the applicable standard of care, individually and collectively, Mr. Marshall aspirated, suffered respiratory and cardiac arrest, and died.

94.    As a proximate result of his untimely and wrongful death, Mr. Marshall's statutory beneficiaries have suffered economic and noneconomic damages, in amounts to be proven at trial.

95.    As a proximate result of his untimely and wrongful death, the Estate has suffered economic damages in amounts to be proven at trial.

96.    The undersigned attaches hereto and incorporates be reference herein Exhibit A to comply with RSMO § 538.225.

WHEREFORE, Plaintiffs pray for such damages in an amount in excess of TWENTY-FIVE THOUSAND ($25,000.00) as are fair and reasonable to compensate them for their damages, plus costs of court.

### THIRD CAUSE OF ACTION – Medical Negligence / Wrongful Death
### BROUGHT BY ALL BENEFICIARIES
### AGAINST DEFENDANT DR. HALASA

97.    Paragraphs 1-81 are hereby restated and realleged.

98.    Dr. Halasa owed decedent Mr. Marshall the duty to comply with the applicable standard of care in the provision of medical care to him.

99.    Dr. Halasa breached his duty to comply with the applicable standard of care in one, or more, or all of the following ways:

a.    Failure timely to round on Mr. Marshall, improperly delaying essential care;

b.    Failure timely to ordered an NG tube and use of suction for Mr. Marshall;

c.      Failure timely to utilize or ensure the utilization of suction following the placement of the NG tube;

d.      Failure timely to order and direct completion of an X-ray or CT of Mr. Marshall's abdomen despite his presentation;

e.      Failure to order and direct in timely fashion, or to himself otherwise check and confirm the placement of the NG tube to allow for immediate use of suction following the NG tube placement;

g.      Failure adequately to elevate Mr. Marshall's bed to at least 30 degrees of incline to reduce the risk of aspiration and/or to order same; and

h.      Otherwise acted negligently to be proven at trial.

100.    As a proximate result of each of these breaches of the applicable standard of care, individually and collectively, Mr. Marshall aspirated, suffered respiratory and cardiac arrest, and died.

101.    As a proximate result of his untimely and wrongful death, Mr. Marshall's statutory beneficiaries have suffered economic and noneconomic damages, in amounts to be proven at trial.

102.    As a proximate result of his untimely and wrongful death, the Estate has suffered economic damages in amounts to be proven at trial.

103.    The undersigned attaches hereto and incorporates be reference herein Exhibit A to comply with RSMO § 538.225.

WHEREFORE, Plaintiffs pray for such damages in an amount in excess of TWENTY-FIVE THOUSAND ($25,000.00) as are fair and reasonable to compensate them for their damages, plus costs of court.

**FOURTH CAUSE OF ACTION – Medical Negligence / Survival Action**
**BROUGHT BY JAMIE MARSHALL AS PERSONAL REPRESENTATIVE OF ESTATE**
**AGAINST MERCY HOSPITAL**

104.    Paragraphs 1-81 are hereby restated and realleged.

105. Mercy Hospital owed decedent Mr. Marshall the duty to comply with the applicable standard of care in the provision of medical care to him.

106. Defendant, Mercy Hospital, breached its duty to comply with the applicable standard of care in one, or more, or all of the following ways:

a. Failure to see that its staff timely rounded on Mr. Marshall, improperly delaying essential care;

b. Failure to see that its staff timely ordered an NG tube and use of suction for Mr. Marshall;

c. Failure to see that its staff timely effectuated and utilized suction following the placement of the NG tube;

d. Failure to complete in timely fashion a CT that was ordered "STAT," delaying the use of suction;

e. Failure to order and direct in timely fashion, or to otherwise check and confirm the placement of the NG tube to allow for immediate use of suction following the NG tube placement;

f. Failure to maintain operable suction in Mr. Marshall's hospital room, or the failure adequately to train hospital staff as to how to use suction in the room;

g. Failure to see that its staff adequately elevated Mr. Marshall's bed to at least 30 degrees on incline to reduce the risk of aspiration and/or to train its staff as to the importance of same;

h. Failure properly to monitor and assess the risks of Mr. Marshall's condition to avoid and/or react to emergent vomiting, aspiration of said vomit and the death of Mr. Marshall;

i. Failure properly to train its staff with regard to the placement and use of NG tubes, suction and the elevation of a patient in order to prevent and/or minimize vomiting and the aspiration of vomiting;

j. Failure properly to monitor and supervise its staff with regard to the placement and use of NG tubes, suction and the elevation of a patient in order to prevent and/or minimize vomiting and the aspiration of vomiting; and

k.     Otherwise acted negligently to be proven at trial.

107.   Defendant Mercy Hospital further may have further breached its duty to comply with the applicable standard of care, including in the (a) insufficient and inadequate treatment of Mr. Marshall's infection prior to discharging him; and (b) improper discharge of Mr. Marshall with severe and insufficiently treated necrotizing pancreatitis and the infection that led to his readmission within days with sepsis.

108.   As a proximate result of each of these breaches of the applicable standard of care, individually and collectively, Mr. Marshall aspirated and suffered respiratory and cardiac arrest.

109.   Mr. Marshall suffered greatly as he aspirated on his own vomit prior to his death, unable to clear his own airway.

110.   Mr. Marshall experienced severe pain and suffering as his life slipped away from him, including as he suffered cardiac arrest and the extraordinary fear of his own impending death, knowing family members were looking on.

111.   Mr. Marshall, and thus his Estate as a result of his passing, suffered untold damages, in amounts to be proven at trial, from the suffering he experienced in the lead-up to his untimely death. WHEREFORE, Plaintiff prays for such damages in an amount in excess of TWENTY-FIVE THOUSAND ($25,000.00) as are fair and reasonable to compensate Plaintiff for the damages, plus costs of court.

### FIFTH CAUSE OF ACTION – Medical Negligence / Survival Action
### BROUGHT BY JAMIE MARSHALL AS PERSONAL REPRESENTATIVE OF ESTATE AGAINST DR. KROEGER

112.   Paragraphs 1-81 are hereby restated and realleged.

113.   Dr. Kroeger owed decedent Mr. Marshall the duty to comply with the applicable standard of care in the provision of medical care to him.

114.    Dr. Kroeger breached his duty to comply with the applicable standard of care in one, or more, or all of the following ways:

a.    Failure timely to round on Mr. Marshall, improperly delaying essential care;

b.    Failure timely to ordered an NG tube and use of suction for Mr. Marshall;

c.    Failure timely to utilize or ensure the utilization of suction following the placement of the NG tube;

d.    Failure timely to order and direct completion of an X-ray or CT of Mr. Marshall's abdomen despite his presentation;

e.    Failure to order and direct in timely fashion, or to himself otherwise check and confirm the placement of the NG tube to allow for immediate use of suction following the NG tube placement;

g.    Failure adequately to elevate Mr. Marshall's bed to at least 30 degrees of incline to reduce the risk of aspiration and/or to order same; and

h.    Otherwise acted negligently to be proven at trial.

115.    As a proximate result of each of these breaches of the applicable standard of care, individually and collectively, Mr. Marshall aspirated and suffered respiratory and cardiac arrest.

116.    Mr. Marshall suffered greatly as he aspirated on his own vomit prior to his death, unable to clear his own airway.

117.    Mr. Marshall experienced severe pain and suffering as his life slipped away from him, including as he suffered cardiac arrest and the extraordinary fear of his own impending death, knowing family members were looking on.

118.    Mr. Marshall, and thus his Estate as a result of his passing, suffered untold damages, in amounts to be proven at trial, from the suffering he experienced in the lead-up to his untimely death.

WHEREFORE, Plaintiff prays for such damages in an amount in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) as are fair and reasonable to compensate Plaintiff for the damages, plus costs of court.

### SIXTH CAUSE OF ACTION – Medical Negligence / Survival Action
### BROUGHT BY JAMIE MARSHALL AS PERSONAL REPRESENTATIVE OF ESTATE AGAINST DR. HALASA

119.    Paragraphs 1-81 are hereby restated and realleged.

120.    Dr. Halasa owed decedent Mr. Marshall the duty to comply with the applicable standard of care in the provision of medical care to him.

121.    Dr. Halasa breached his duty to comply with the applicable standard of care in one, or more, or all of the following ways:

a.    Failure timely to round on Mr. Marshall, improperly delaying essential care;

b.    Failure timely to ordered an NG tube and use of suction for Mr. Marshall;

c.    Failure timely to utilize or ensure the utilization of suction following the placement of the NG tube;

d.    Failure timely to order and direct completion of an X-ray or CT of Mr. Marshall's abdomen despite his presentation;

e.    Failure to order and direct in timely fashion, or to himself otherwise check and confirm the placement of the NG tube to allow for immediate use of suction following the NG tube placement;

g.    Failure adequately to elevate Mr. Marshall's bed to at least 30 degrees of incline to reduce the risk of aspiration and/or to order same; and

h.    Otherwise acted negligently to be proven at trial.

122.    As a proximate result of each of these breaches of the applicable standard of care, individually and collectively, Mr. Marshall aspirated and suffered respiratory and cardiac arrest.

123. Mr. Marshall suffered greatly as he aspirated on his own vomit prior to his death, unable to clear his own airway.

124. Mr. Marshall experienced severe pain and suffering as his life slipped away from him, including as he suffered cardiac arrest and the extraordinary fear of his own impending death, knowing family members were looking on.

125. Mr. Marshall, and thus his Estate as a result of his passing, suffered untold damages, in amounts to be proven at trial, from the suffering he experienced in the lead up to his untimely death.

WHEREFORE, Plaintiff prays for such damages in an amount in excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) as are fair and reasonable to compensate Plaintiff for the damages, plus costs of court.

### AMENDED SEVENTH CAUSE OF ACTION - *Res Ipsa Loquitur* BROUGHT BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

126. Paragraphs 1-81 are hereby restated and realleged.

127. The injury suffered by Mr. Marshall-namely, aspiration of his own vomit and subsequent respiratory and cardiac arrest and death despite having an NG tube place and being purportedly closely monitored and treated for ongoing vomiting, sepsis, and necrotizing peritonitis- does not ordinarily occur in the absence of negligence by one or more members of the care team.

128. The instrumentalities of the Mr. Marshall's care, including all medications, monitoring equipment, and tools, including the NG tube, the CT machine and timing of use thereof, suction in the hospital room, and the incline of the hospital bed, were in the exclusive control of the Defendants, individually and collectively.

129. Mr. Marshall did not cause or contribute to his own death in any way, as he had communicated his increasing abdominal pain and his difficulty with vomiting over nearly a 24-hour period preceding his aspiration and death, and he submitted to the care of Mercy Hospital and Dr. Kroeger and Dr. Halasa to address his ailments.

130. The doctrine of *res ipsa loquitur* applies in this case, such that Plaintiff is entitled to an inference that negligence on the part of the Defendants, Dr. Kroeger, Dr. Halasa, and Mercy Hospital caused Mr. Marshall's death.

131. As a proximate result of Defendants' negligence, individually and collectively, Mr. Marshall's Estate has suffered economic and noneconomic damages in amounts to be proven at trial for Mr. Marshall's extraordinary pain and suffering in advance of his passing.

132. As a proximate result of Defendants' negligence, individually and collectively, and Mr. Marshall's untimely and wrongful death, the statutory beneficiaries have suffered economic and non-economic damages in amounts to be proven at trial.

133. That the patient who received the treatment is deceased and cannot participate in prosecuting this action. His next-of-kin were not in any way controlling or participating in the treatment which is the subject of this lawsuit; in addition, his next-of-kin do not have the technical, medical background to have permitted them to control or participate in the treatment that occurred.

134. That the Defendants actually controlled and participated in the treatment and have the technical, medical background and therefore, possess superior knowledge or means of information as to the cause of the occurrence.

WHEREFORE, Plaintiffs pray for such damages in an amount of excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) as are fair and reasonable to compensate them for their damages, plus costs of court.

### AMENDED EIGHTH CAUSE OF ACTION - Vicarious Liability/ *Respondeat Superior* BROUGHT BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS

135. Paragraphs 1-30 and 32-81 are hereby restated and realleged.

136. For purposes of the medical care provided to decedent Mr. Marshall as alleged herein, Defendant Mercy Hospital, on information and belief, employed all care personnel assigned to the care and treatment of Mr. Marshall, including Dr. Kroeger and Dr. Halasa, and all nursing staff, and also including Melissa Munden, RN, the nurse who was unable to operate suction in Mr. Marshall's hospital room.

137. On information and belief, for purposes of the medical care provided to decedent Mr. Marshall as alleged herein, Defendant Mercy Hospital also employed for Doe Defendants 1-5, and each of them.

138. As employer for the individual healthcare providers, Defendant Mercy Hospital is vicariously liable for the tortious acts or omissions of these individual healthcare providers as otherwise alleged herein, and is vicariously liable fora all damages caused thereby.

139. That DOES 1 to 5, as alleged in this Amended Count VIII, are persons or entities whose true names and identities are not known to Plaintiffs at this time. On information and belief, these "placeholder" Defendants, and each of them, are residents of the State of Missouri and/or are present and transacting business in the State of Missouri and in this judicial district; furthermore, said Defendants are all employees of one or more of the specifically named Defendants and they include the nurses, LPN's,

orderlies, technicians and/or doctors who were responsible for one, or more, or all of the following matters during Mr. Marshall's hospitalization on September 27, 28 and 29, 2023:

a. Monitoring and reporting on Mr. Marshall's condition of ill-being, including his vomiting and other symptoms;

b. Proper placement and setting up of a naso-gastric tube and seeing that suction was properly connected, working and functional at all necessary times; and

c. Seeing that Mr. Marshall's bed was properly angled at a minimum of 30 degrees elevation.

d. The setting of the bed incline at an incline under 30 degrees, or allowance to remain at such an incline;

e. The lack of sufficient investigation upon the sudden and severe onset of abdominal pain on the evening of September 28 through September 29;

f. The lack of sufficient action to address bilious vomit and nausea of Christopher on the evening of September 28 through September 29;

g. The preparation of an insufficient care plan upon the change in condition of Christopher on September 28 into September 29;

h. The lack of diligence in ensuring timely medical imaging of Christopher on September 29;

i. The failure to alert treaters about the risks identified on the medical imaging undertaken on September 29;

j. The failure to utilize suction with Christopher following placement of an NG tube, despite an expectation from doctors that suction would be utilized;

k. The failure of treaters to ensure that suction was being promptly utilized with the NG tube;

l. The failure to use other means to ensure placement of the NG tube when STAT imaging was not performed on Christopher;

m. The failure to provide imaging rapidly despite an order for STAT imaging;

n. The failure to adequately train nursing staff to utilize suction;

o. The failure to ensure operational suction in Christopher's hospital room; and

p. The failure to utilize suction on Christopher in his hospital room.

WHEREFORE, Plaintiffs pray for such damages in an amount of excess of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) as are fair and reasonable to compensate them for their damages, plus costs of court.

Respectfully submitted,

**PLAINTIFF DEMANDS**
**TRIAL BY JURY**

BY:/s/ Benjamin P. Tobin
BENJAMIN P. TOBIN - #63604
PRATT & TOBIN, P.C.
150 South Bellwood Drive
East Alton, IL 62024
Telephone: (618) 259-8011
            (800) 851-5562
Facsimile: (618) 259-6793
E-mail: lawoffice@prattandtobin.com
E-mail: btobin@prattandtobin.com

Edward J. Szewczyk, #IL2791765
PRATT & TOBIN, P.C.
150 S. Bellwood Drive
East Alton, IL 62024
Telephone: (618) 259-8011
Facsimile: (618) 259-6793
ejs@prattandtobin.com

and

C. N. COBY COHEN (*pro hac vice forthcoming*)
ROSSI VUCINOVICH, PC
1000 Second Ave., Suite 1420
Seattle, WA 98104
Telephone:  (425) 646-8003
Facsimile:  (425) 646-8004
E-mail:  ccohen@rvflegal.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2026, I electronically filed the **Plaintiff's First Amended Complaint and Jury Demand** with the Clerk of the above Court using the CM/ECF system, which will send notification of such filing on the following attorneys.

Matthew S. Shorey, Esq.
Corbin M. Robinson, Esq.
Sandberg Phoenix & von Gontard P.C.
701 Market Street, Suite 600
St. Louis, MO 63101-1826
314-231-3332
314-241-7604 (fax)
mshorey@sandbergphoenix.com
crobinson@sandbergphoenix.com
*Attorneys for Defendants*

/s/ Benjamin P. Tobin